UNITED STATES of America, Plaintiff,

v.

Maria PAREDES–MOYA and Susie Vela, Defendants.

Crim. No. CR3–88–262–D.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 13, 1989.

James T. Jacks, Ass't U.S. Atty., for U.S.

Mark S. Werbner (court appointed), of Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Maria Paredes–Moya.

Arch C. McColl, III (court appointed), of Bruner, McColl & McColloch, Dallas, Tex., for Susie Vela.

FITZWATER, District Judge:

Defendants' motions to suppress the fruits of two wiretap orders and a search warrant present the questions whether *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), applies to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, whether the affidavits submitted in support of the wiretap applications contain false statements and material omissions sufficient to void the interceptions, and whether the defendants have standing to challenge the search warrant. The court concludes that *Franks* applies but that, analyzed under *Franks*, the interceptions were valid. The court holds the defendants lack standing to challenge the search and seizure. The court thus denies the motions to suppress.[1]

I.

Maria Paredes–Moya ("Maria") and her adult daughter, Susie Vela ("Susie"), are two defendants charged in a multi-defendant, multi-count indictment. The government alleges they were members of a heroin distribution organization that consisted of several Moya family members. The defendants are charged with conspiring to import and importing large quantities of Mexican black tar heroin into the Northern District of Texas for distribution.

Beginning in 1986 the Drug Enforcement Administration ("DEA") and members of a drug enforcement task force that included narcotics officers of the Dallas Police Department ("DPD") began actively investigating the Moya organization. Following the employment of other investigative techniques, including extensive use of information provided by Norma Aguilar ("Norma"), a family member who had turned government informant, the government in the Summer and Fall of 1988 applied for and obtained orders permitting it to intercept communications to three digital pagers and over a telephone used to conduct heroin distribution activities.[2]

---

1. The court denied the motions by order filed September 21, 1989. To afford the parties reasonable notice of its decision prior to the scheduled October 2, 1989 trial date, the court entered the order in advance of filing this opinion, which constitutes the court's essential findings. *See* Fed.R.Crim.P. 12(e).

2. These and the other facts set forth in this opinion are based upon a preponderance of the evidence adduced at the *Franks* hearing. Nothing in the opinion affects the presumption that

On July 7, 1988 the government obtained from Judge Sanders an order authorizing the government to intercept—by use of clone pagers—electronic communications transmitted to three digital display paging devices. This order was subsequently extended on August 10, 1988, October 5, 1988, and November 10, 1988. The interceptions occurred between July 8 and December 5, 1988. On November 10, 1988 Judge Sanders authorized the government to intercept wire communications over a telephone located at 1436 Templecliff, Dallas, Texas, which the organization used to facilitate its heroin distribution activities. On December 13, 1988 DEA agents obtained from U.S. Magistrate Sanderson a warrant to search Unit 215, Lock–N–Key, 3333 North Buckner Blvd., Dallas, Texas. The government culminated its investigation on December 13, 1988, when it arrested several family members and searched the mini-warehouse unit and seized heroin and other items from the unit.

Maria filed motions to suppress the contents of the pager and telephone interceptions and the mini-warehouse search. With leave of court, Susie adopted the motions. Maria and Susie assert they are "aggrieved persons" within the meaning of 18 U.S.C. § 2518(10)(a) and so may move for suppression. The court conducted a *Franks* hearing on September 7, 8, 13, 14, and 18 to permit the defendants to challenge the applications and affidavits submitted by the government to procure the interception orders and search warrant.

## II.

Defendants move to suppress the December 13, 1988 search and seizure at the mini-warehouse on the ground the affidavit submitted by the DEA to obtain the search warrant was defective in several respects. The motion may be rejected on the narrow ground that both defendants lack standing to challenge the search and seizure.

The unit in question apparently was rented by Maria's sister, Sylvia Ventura ("Sylvia"), and the lease was in Sylvia's name.[3] In order for Maria and Susie to have standing to challenge the search, each must have a legitimate expectation of privacy in the place. *United States v. Salvucci,* 448 U.S. 83, 92–93, 100 S.Ct. 2547, 2553–54, 65 L.Ed.2d 619 (1980). The burden of establishing this expectation is upon Maria and Susie as the movants. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978); *United States v. Antone,* 753 F.2d 1301, 1306 (5th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Neither ownership of the place searched nor presence at the time of the search is required to establish a legitimate expectation of privacy. *United States v. Johns,* 851 F.2d 1131, 1136 (9th Cir.1988). Rather, the determination whether an individual's legitimate expectation has been violated requires examination of several factors. *United States v. Briones–Garza,* 680 F.2d 417, 420 (5th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 181 (1982). Among the factors a court must examine are:

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion; whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

*Id.* (citing *United States v. Haydel,* 649 F.2d 1152, 1154–55 (5th Cir.1981)). No one factor should be controlling. If the record indicates the defendant is a party to a formalized arrangement to jointly supervise and control the place searched, the defendant may claim a legitimate expectation of privacy. *Compare Johns,* 851 F.2d

---

the defendants are innocent of the charges against them.

**3.** These facts are contained in the government's written opposition to Maria's motion to suppress. Although the facts were not placed in

evidence at the hearing, the burden of proof is upon Maria to show her standing. She did not dispute the government's position that the lease was not in her name.

at 1136 (concluding defendant who owned some chemicals found in storage unit and paid part of rent had standing to complain of Fourth Amendment violations although his name was not on rental agreement) *with United States v. McCulley*, 673 F.2d 346, 352 (11th Cir.) (concluding defendants whose names were not on car rental agreement and who did not have property in car, but who had agreed to share expenses, did not have legitimate expectation of privacy), *cert. denied*, 459 U.S. 852, 103 S.Ct. 116, 74 L.Ed.2d 102 (1982).

■ In this case, neither Maria nor Susie introduced evidence that either of them had any expectation of privacy in the mini-warehouse. In response to the court's inquiry whether Susie had such an expectation, Susie's counsel conceded at the hearing that it would "probably [be] tough to make that out." Tr. 3:53.[4] Maria demonstrated through the testimony of DEA Agent Benjamin Victor Routh ("Agent Routh") that the mini-warehouse unit in question was padlocked and the lock had to be cut in order to gain access. Agent Routh also testified that personal letters and bank statements were found in the unit. This proves that *someone* had an expectation of privacy, but not that Maria did. Maria and Susie did not adduce evidence sufficient to establish Fourth Amendment standing.

### III.

The court next considers defendants' motions to suppress the digital pager and telephone wiretap interceptions. Because defendants' challenges to the orders overlap in certain respects, the court will consider the motions together.

### A.

The government applied to the court on July 7, 1988 for an order authorizing the government to intercept electronic communications received by three digital display paging devices. The government alleged

the pagers were leased by Maria and used by Maria and her brother, Candido Moya ("Candido"), to engage in narcotics distribution. Maria and Candido were alleged to be participants in a large scale narcotics importation and trafficking organization operating in Texas. The application was supported by the affidavit of DEA Special Agent Edward F. Senecal, Jr. ("Agent Senecal"). The 13–page affidavit contained 23 paragraphs in which the government justified its request for authority to intercept the pager communications by means of clone pagers. Judge Sanders signed the authorization order the same day, permitting the interceptions for no more than 30 days. *See* 18 U.S.C. § 2518(5) (order may not exceed period necessary to achieve objective of authorization and in no event may permit interception for more than 30 days). The order was extended on August 10, 1988, October 5, 1988, and November 10, 1988.

On November 10, 1988, the government applied to Judge Sanders for authorization to intercept wire communications over a telephone subscribed to by Maria and located at 1436 Templecliff in Dallas, Texas. The government alleged the telephone was being used by Maria, Candido, and Susie, and co-defendants, Jose Luis Vela ("Jose") (Susie's husband), Viola Moya, and Adam Victor Guerra–Marez ("Adam"), to distribute heroin. The application was supported by a 42–page, 79–paragraph, affidavit of Agent Senecal. Judge Sanders granted the application on November 10, 1988, authorizing interception in accordance with § 2518(5) and, in no event, for more than 30 days. The wiretap was conducted from November 14, 1988 to December 13, 1988.

Defendants contend the fruits of the digital pager interceptions should be suppressed pursuant to 18 U.S.C. § 2518(10)(a) because: the July 7, 1988 affidavit[5] that supported the government's application contained false and misleading statements;

---

**4.** Transcript references are to the volume and page of the hearing transcript.

**5.** The motion also adverts to false and misleading statements in the government's application.

Defendants did not attempt to prove at the hearing, however, that the application contained infirmities. The court thus addresses only the affidavit.

the interceptions should not have exceeded 30 days; and the government failed to record the interceptions on tape, wire, or other comparable devices in accordance with § 2518(8)(a).

Defendants contend the court should suppress the intercepted telephone communications because: the government relied on the fruits of the unlawful digital pager interceptions; the November 10, 1988 affidavit submitted by Agent Senecal contained false and misleading statements regarding the necessity for the wiretap order; the affidavit was misleading because it intentionally failed to disclose material facts regarding Norma; the affidavit[6] failed adequately to show that normal investigative procedures had been tried and had failed or reasonably appeared to be unlikely to succeed if tried or to be too dangerous; and the government failed properly to minimize the interceptions.

### B.

The court begins by rejecting defendants' contention that the pager interceptions must be suppressed because the government failed to comply with § 2518(8)(a). This section provides that "[t]he contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, *if possible*, be recorded on tape or wire or other comparable device." *Id.* (Emphasis added).

Agent Senecal testified that the government intended, as it had represented in Senecal's affidavit, *see* ¶ 22, to record all communications intercepted through the digital display pager. Tr. 4B:169. By the term "record," Agent Senecal meant the communications would be memorialized by machine or by hand. *Id.* at 170–71. To facilitate the recording function, the DEA provided its Dallas office with a machine capable of receiving signals over the airwaves. When a target pager was activated, the machine would recognize the pager and record the date, time, telephone number, and any numerical codes transmitted with the number. The device was based on fairly new technology and failed to function properly. The DEA was thus compelled to maintain the interception records by hand. An agent wore a clone pager that received the same signals received by the target pager. When the clone pager received a signal, the agent recorded in a log book the data received by the clone.

Section 2518(8)(a) requires recording "if possible ... on tape or wire or other comparable device." The statute does not define the word "possible" nor has the court located any decision that addresses the meaning of the term. The government made a good faith, reasonable effort to record the pager interceptions with an electronic device. The device failed. Thus, electronic recording was not possible—at least with the equipment the government attempted to use. The defendants have not shown there was a device available that the government intentionally or otherwise failed to use. Absent such a showing the court concludes that recording was not possible.

Even were the court to agree that recording on tape, wire, or other comparable device was possible in this case, it would not grant defendants' motion. Suppression is required only when failure to satisfy a requirement of Title III impairs the "congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974). This court concurs with other courts that have concluded the purpose of § 2158(8)(a) is not to limit the use of interceptions in any way, but rather to ensure the admissibility of the intercepted communications at trial. *See, e.g., United States v. Clerkley*, 556 F.2d 709, 718–19 (4th Cir.1977) (relying on legislative history to conclude that—unlike investigatory exhaustion, judicial authorization, and minimization require-

---

**6.** The motion makes reference to the application, but the court evaluates here only the affidavit. *See supra* note 5.

ments—recording requirement served no Fourth Amendment purpose), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978); *United States v. Daly,* 535 F.2d 434, 442 (8th Cir.1976) (purpose of recording requirement is to ensure admissibility); *United States v. Gerena,* 695 F.Supp. 1379, 1393–94 (D.Conn.1988) (purpose of recording is evidentiary). Because the purpose of § 2158(8)(a) is evidentiary, failure to record is not a ground for exclusion of the wiretap evidence absent an allegation that incriminating statements were taken out of context while omitting related mitigating statements. *Clerkley,* 556 F.2d at 719 n. 8; *Daly,* 535 F.2d at 442.

The court's refusal to suppress the pager interceptions on this ground is further buttressed by the statute's requirement that the recording "shall be done in such a way as will protect the recording from editing or other alterations." 18 U.S.C. § 2518(8)(a). This provision manifests Congress' desire to prevent alterations and to ensure disclosure to the defendants of all intercepted communications. *See United States v. DiMuro,* 540 F.2d 503, 512 n. 15 (1st Cir.1976) (purpose is to assure accuracy), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977); *United States v. Crouch,* 528 F.2d 625, 629 (7th Cir.) (purpose is to assure disclosure), *cert. denied,* 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 184 (1976). Defendants neither adduced evidence nor created a reasonable inference that the government failed to record the pager output in order to facilitate later "editing or other alterations." To the contrary, the evidence supports the finding that the government reasonably attempted to record the output and, due to a device failure, recording was not possible. Based upon the evidence at the hearing, the court concludes the government complied with the requirement that it record the pager signals if possible.

## C.

■ The court also rejects defendants' assertions that the digital pager intercep-

tions unlawfully exceeded the 30–day maximum period of interception in violation of § 2518(5). The total period of interception was authorized not only by the initial July 7, 1988 order but also by extension orders signed August 10, 1988, October 5, 1988, and November 10, 1988. Extensions are expressly permitted by § 2518(5). Defendants failed to demonstrate the extension orders were unsupported by applications and affidavits that satisfied the requirements of § 2518(1)(f) (application for extension shall set forth results thus far obtained from interception or reasonable explanation of failure to obtain such results).

## D.

Defendants contend the November 10, 1988 telephone interceptions are invalid because they are the fruits of invalid digital pager interceptions. Because the court concludes *infra* that the digital pager interceptions were properly authorized, the court declines to suppress the November 10, 1988 wiretap on this basis.

## E.

■ Defendants also challenge the telephone interceptions on the ground the government failed to minimize the interceptions as required by § 2518(5). This section requires that every wiretap order shall provide that the authorization to intercept "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." The statute does not forbid the interception of all nonrelevant conversations, "but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 1725, 56 L.Ed.2d 168 (1978). The court is unpersuaded that any failure to minimize rose to a level sufficient to require suppression.[7]

---

**7.** On further reflection, the court concludes that Maria's motion, as adopted by Susie, was too conclusory to warrant an evidentiary hearing on the issue of minimization. In the Second

Circuit, for example, the court need not convene an evidentiary hearing unless the defendant can demonstrate that a substantial number of nonpertinent conversations were intercepted unrea-

Defendants' evidence consisted of an analysis of the government's logs—which reflect that 76.5% of all calls over two minutes in length were not minimized—and the testimony of two persons who listened to many of the intercepted calls and opined that a substantial majority of the nonminimized calls over two minutes in length had no relation to the subject of heroin distribution. Defendants also cross-examined Agent Senecal regarding how the government complied with the obligation to minimize.

The court declines to credit the 76.5% figure proffered by the defendants. The Supreme Court has made clear that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to a correct answer. Such percentages may provide assistance, but there are surely cases ... where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable." *Scott*, 436 U.S. at 140, 98 S.Ct. 1724. As the Supreme Court has explained, there are several reasons why many nonpertinent calls may be intercepted: there may have been short calls, one-time only calls, and calls that were ambiguous in nature or apparently involved guarded or coded language. *Id.* Therefore, the district court should consider the circumstances of the wiretap. *See United States v. Angiulo*, 847 F.2d 956, 979 (1st Cir.) (factors to be considered are nature, scope, and complexity of criminal activity, extent to which government had previously accrued information needed to screen irrelevant calls, and degree of judicial involvement), *cert. denied*, — U.S. —, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988); *United States v. Garcia*, 785 F.2d 214, 224 (8th Cir.) (factors to be considered include scope of enterprise, expectation of content of calls, extent of judicial supervision, length of calls, origin of calls, and whether calls are coded), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986).

Moreover, "[w]hen the investigation is focusing on what is thought to be a wide-spread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott*, 436 U.S. at 140, 98 S.Ct. at 1725. Where co-conspirators are involved or a phone is located in the residence of a person thought to be the head of a major drug ring, minimizing may not be so strictly scrutinized. *Id.* It is also important to determine at what point during the surveillance period the interception was made. "During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter." *Id.* at 141, 98 S.Ct. at 1725.

In the absence of evidence that explains the significance of the 76.5% figure, the court will not suppress the telephone interceptions on that basis alone.

Defendants also introduced the testimony of two witnesses. One had listened to approximately 100 random, intercepted conversations. He opined that 70% "clearly had nothing to do with any drugs or anything of that nature." Tr. 5:231. He also testified, *id.* at 206–07, that the tapes confirmed Norma's earlier testimony that family members were not hesitant to talk about drugs on the telephone and "got right to the point" in such conversations. *See* Tr. 4B:86–88. As a general rule, this pattern fit other random conversations that the witness analyzed. The witness listened to certain conversations that exceeded five minutes in duration and "struck [him] as clearly not related to the criminal investigation." Tr. 5:208. He also reviewed conversations involving Norma in which she and another party were clearly discussing drugs. *Id.* at 227–28.

The other witness listened to hundreds of intercepted conversations that, in her estimation, "didn't have anything to do with criminality or criminal conversations." *Id.* at 238. This witness thus agreed with the conclusion that approximately 70% of the conversations "didn't necessarily include

---

sonably. *See United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). Having grant-

ed a hearing on this issue, however, the court will decide the question.

any obvious criminality to them." *Id.* at 239.

The court declines to give this testimony controlling weight for at least three reasons. First, when it is reasonable to believe a conversation might turn to criminal matters, the government is not required to cease listening when the colloquy begins in a noncriminal manner. *See United States v. Wilson,* 835 F.2d 1440, 1445–46 (D.C.Cir. 1987). Agent Senecal explained that government monitors used their best, good faith efforts to predict as quickly as possible whether a conversation was criminal. This task was made difficult in circumstances where two persons who had been known previously to be involved in lengthy criminal discussions were engaged in a normal conversation about daily activities. *Cf. Wilson,* 835 F.2d at 1445 (conversations often began with discussions of pregnancy or babysitting and turned to criminal matters). The monitor might have listened to a call for three minutes and the call terminated before the monitor could minimize it. These types of calls could be included in the category of nonminimized calls that exceeded two minutes in duration and yet contained nothing inculpatory. Or the monitor might, on reflection, listen longer than necessary before minimizing due to the identities of the participants.

The Supreme Court teaches in *Scott* that it can be important to examine the point in an investigation when a nonminimized call is intercepted. During the early stages the agents may find it necessary "to intercept all calls to establish categories of nonpertinent calls." 436 U.S. at 141, 98 S.Ct. at 1725. Defendants made no comprehensive attempt at the hearing to compare conversations that commenced in a noncriminal manner, but at some point involved a drug transaction, with those that never turned to the subject of drugs. Nor did they disclose at what point in the investigation a call was intercepted that they contend should have been minimized. Defendants argue the criminal conversations usually turned promptly to the subject of drugs, *see* Tr. 4B:86–88 & 5:206–07, and could thus have been easily minimized. Norma's testimony concerned telephone conversations involving family members. Tr. 4B:86–88. Defendants did not demonstrate that criminal conversations with non-family members quickly became inculpatory. The court is unwilling to find a failure to minimize on the basis of this evidence.

Second, as the Supreme Court also observed in *Scott,* 436 U.S. at 140, 98 S.Ct. at 1724, it is often pertinent to consider that an investigation involved a multi-party conspiracy and distribution ring and that the telephone in question was listed in the name, and located in the home, of persons thought to be among the most culpable participants. *See also United States v. Jones,* 801 F.2d 304, 315 (8th Cir.1986) (broad and extensive scope of conspiracy was relevant to degree of minimization required); *United States v. Adams,* 759 F.2d 1099, 1115 (3d Cir.) (large number of individuals involved in conspiracy justified seemingly high number of irrelevant calls intercepted), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Williams,* 737 F.2d 594, 605 (7th Cir.1984) (when investigation is of large conspiracy, government can justifiably intercept conversations that prove to be outside Title III authorization with the benefit of hindsight), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). The present case does not involve a discrete crime. Here the government was investigating multiple transactions that were conducted over a telephone used by major figures in the drug ring. Defendants have not shown that, under such circumstances, the government's failure to excise with surgical precision the irrelevant from the pertinent violated its minimization obligation.

Third, the witnesses defendants presented failed to demonstrate their respective abilities to assess whether a conversation was inculpatory. Both witnesses were shown to comprehend the Spanish language. Neither, however, demonstrated special competence or case-specific knowledge that would permit the witness accurately to characterize a call as involving no criminal conduct. By contrast, the monitors utilized by the DEA were required to read the affidavits that had been presented

in support of the wiretap and digital pager applications. And several of the monitors either were trained DEA agents or had prior experience monitoring wiretaps. *See* Tr. 5:162–165.

Additionally, defendants' witnesses may have overlooked criminal conversations because the participants employed code words. A variety of cryptic terms—some extremely subtle—are used by drug distributors in furtherance of their criminal activities. *See, e.g., Garcia,* 785 F.2d at 227 (use of term "calculator" for scale, "green attachment" for sifter, oblique reference to party as "helpful" meaning prospective cocaine sales, vague reference to "something else" meaning cocaine); *United States v. Feola,* 651 F.Supp. 1068, 1111–12 (S.D.N.Y. 1987) ("presents," "tapes," "golf courses," "turkey sandwiches," "roast beef sandwiches," "cars," and "jewelry" used as code for drugs), *aff'd,* 875 F.2d 857 (2d Cir.1989). Some conspirators prearrange the use of terms that have no apparent drug-related meaning unless one knows the code. A conversation that may sound benign to one who is untrained or unfamiliar with other evidence possessed by the government may in fact be incriminating. When the government believes participants may be using codes to communicate, the government can justifiably intercept a broader range of conversations. *Jones,* 801 F.2d at 315; *Adams,* 759 F.2d at 1115; *Williams,* 737 F.2d at 605.

Moreover, conversations that appear to be irrelevant at one point in time may in fact become relevant when considered in conjunction with other conversations (thus the suggestion in *Scott,* 436 U.S. at 141, 98 S.Ct. at 1725, that it is important to ascertain at what point in an investigation an interception is made). In a drug conspiracy case, for example, a telephone conversation that does not involve a drug purchase may be significant because A and B—who will later claim not to know one another—were conversing on familiar terms. *Cf. United States v. Armocida,* 515 F.2d 29, 40 (3d Cir.) (telephone conversations showed defendant was on familiar terms with two suspected drug traffickers), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Defendants' witnesses did not affirmatively demonstrate their respective abilities to differentiate probative conversations from those that lacked evidentiary value.

Defendants offered, as an example of the government's failure to minimize, a telephone conversation in which Susie and a male caller discussed having sexual relations at the caller's apartment. The interception of this conversation was not as egregious as defendants suggest. The caller first asked to speak to Susie's mother, Maria, who is implicated as a leader of the distribution ring. A monitoring agent reasonably could have inferred that the call was not strictly personal and thus not subject to minimization. Moreover, the government contends the caller was Adam Guerra, an alleged co-conspirator and heroin supplier to Maria. Drug conspirators may in fact discuss personal relationships and intersperse their conversations with incriminating evidence. *See Wilson,* 835 F.2d at 1445.

Finally, the court concludes the government undertook reasonable steps to comply with its obligation to minimize. As in *United States v. Santoro,* 647 F.Supp. 153, 161 (E.D.N.Y.1986), in the present case an assistant U.S. Attorney and a DEA supervisor instructed the monitors on the legal requirements for conducting the wiretap, including the obligation to minimize irrelevant interceptions. The monitors were instructed to minimize conversations involving lawyer and client, clergy, husband and wife (unless of a criminal nature), and those not of an inherent criminal nature. The monitors used their best, good faith efforts to predict whether a conversation was criminal and to do so as quickly as possible. They were instructed to minimize the calls of persons not known to be involved in heroin trafficking or calls of nonevidentiary value. There was no evidence of monitoring without recording and there was no automatic recording in the absence of a monitor. Each monitor was required to familiarize himself with the contents of the court's wiretap order and the affidavits submitted by the government in support of

the digital pager and telephone intercept applications. The record reflects the government attempted reasonably to comply with the minimization requirement of the telephone interception order.

### F.

The remaining challenges to the digital pager and telephone interceptions are predicated upon allegations that Agent Senecal intentionally, or with reckless disregard for the truth, made false and misleading statements in his supporting affidavits of July 7, 1988 and November 10, 1988 and intentionally or recklessly failed to disclose information that would have been material to Judge Sanders' decision whether to issue the interception orders.

Defendants contend the July 7, 1988 affidavit contained these false and misleading statements:

1. paragraph 21(c) stated that infiltration of the Moya narcotics organization by an undercover agent was extremely dangerous and highly unlikely to be successful; and

2. paragraph 21(d) stated the cooperating individual could only provide direct evidence as to Maria's participation in narcotics trafficking and could not identify other co-conspirators and Maria's source of supply for heroin.

Defendants argue the affidavit was also false or materially misleading in failing to disclose:

3. that the individuals under investigation had already been infiltrated by an undercover agent or informant;

4. that Norma was an informant for, and was willing to testify on behalf of, the government in order to assist her mother, who is serving lengthy drug offense sentences pursuant to state and federal convictions;

5. that Norma secretly recorded telephone conversations with the defendants and others and could prove every aspect of the conspiracy alleged by the government in count 1 of the indictment;

6. that Norma knew the source of heroin, the time of delivery, and was personally present to watch one pound quantities of heroin cut and prepared for distribution; and

7. that Norma would be highly motivated to lie given that her mother was incarcerated for lengthy drug offense sentences and would be eligible for state parole in approximately 1991.

According to defendants, the November 10, 1988 affidavit was false or materially misleading in stating:

1. that the interception of wire communications is the only available technique which has a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that Maria, Candido, and others have engaged in the criminal conduct alleged by the government (¶ 64);

2. that other investigative procedures have failed (¶ 65);

3. that the confidential informants exist on the fringe of the organization (¶ 69);

4. that the confidential informants have no direct contact with mid- or high-level members of the organization (¶ 69);

5. that the informants would refuse to testify before the grand jury or at trial (¶ 69); and

6. that the informants cannot furnish information sufficient to identify Maria's source of supply (¶ 70).

Defendants posit the affidavit was also false or materially misleading in failing to disclose:

7. the nature and extent of cooperation and assistance provided by Norma; and

8. the motives that prompted Norma's cooperation.

The court agrees with the defendants that the affidavits in question contain false statements, partial truths, and material omissions. These errors should not be repeated by the government in future wire

interception applications. Nevertheless, for the reasons that follow, the court concludes the orders are not invalid and the contents of the orders should not be suppressed.

–1–

■ In *Franks* the Supreme Court held that, under limited circumstances, a defendant is entitled to an evidentiary hearing for the purpose of establishing that a search warrant should be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. 438 U.S. at 155–56, 98 S.Ct. at 2676–77. To demonstrate a right to a hearing, the defendant must make a substantial preliminary showing that a false statement was knowingly and intentionally made by the affiant in the search warrant affidavit. If the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be convened at the defendant's request. *Id.* The search warrant must then be voided—and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit—(1) if the defendant proves by a preponderance of the evidence that the affidavit contains a knowing and intentional false statement or a false statement made with reckless disregard for the truth and (2) with the affidavit's false material set to one side, the remaining content is insufficient to establish probable cause. *Id.* at 156, 98 S.Ct. at 2676.

■ Although the Fifth Circuit has not expressly [8] held that *Franks* applies to a Title III [9] wire interception, this court concludes that *Franks* does apply and follows the lead of other courts that have reached this conclusion. *E.g., United States v. Ippolito,* 774 F.2d 1482, 1485 (9th Cir.1985) (*Franks* emphasizes importance of truthful information to neutral detached magistrate who must determine probable cause; same kinds of considerations important to district court when it must decide whether to issue wiretap order); *Garcia,* 785 F.2d at 222 (purpose of applications for wiretap and search warrant similar; thus *Franks* applies to wiretap applications); *United States v. Cantu,* 625 F.Supp. 656, 662–63 (N.D.Fla.1985) (no reason why motion for hearing to suppress wiretap evidence should be treated differently than other kind of evidence).[10] The Fourth Amendment is no less applicable to a wiretap order than it is to a search warrant.

Applying *Franks* to the present context, this court must determine whether Agent Senecal either lied or made reckless misstatements or omissions in the affidavits in question. If he did, the court must then decide whether the false statements or omissions were material in causing the

---

**8.** The Fifth Circuit held in *United States v. Cuevas–Sanchez,* 821 F.2d 248, 252 (5th Cir.1987), that the defendant could not sustain a *Franks* attack upon an order authorizing video surveillance of the exterior of his property. The opinion assumed the applicability of *Franks* without noting that the Fifth Circuit had not adopted *Franks* in the Title III context. *See also United States v. Brown,* 692 F.2d 345, 349–50 (5th Cir. 1982) (where defendant offered no evidence that government agents lied in wiretap application, defendant not entitled to *Franks* hearing).

**9.** Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520.

**10.** *See also United States v. Page,* 808 F.2d 723, 728 (10th Cir.) (assuming applicability of *Franks*), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987); *United States v. Cole,* 807 F.2d 262, 268 (1st Cir.1986) (same), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987); *United States v. Southard,* 700 F.2d 1, 7–8 (1st Cir.) (same), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *United States v. Valdez–Pacheco,* 701 F.Supp. 775, 781 (D.Or.1988) (same); *United States v. Levy,* 694 F.Supp. 1136, 1147 (D.N.J.1988) (same); *United States v. Mancari,* 663 F.Supp. 1343, 1356 (N.D.Ill.1987) (same); *United States v. Feola,* 651 F.Supp. 1068, 1108 (S.D.N.Y.1987) (same), *aff'd,* 875 F.2d 857 (2d Cir.1989); *United States v. Santoro,* 647 F.Supp. 153, 159 (E.D.N.Y. 1986) (same), *aff'd,* 880 F.2d 1319 (2d Cir.1989); *United States v. Ramirez,* 602 F.Supp. 783, 789 (S.D.N.Y.1985) (same); *United States v. Harvey,* 560 F.Supp. 1040, 1047 (S.D.Fla.1982) (same), *aff'd sub nom. United States v. Van Horn,* 789 F.2d 1492 (11th Cir.), *cert. denied,* 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 124 (1986); *cf. United States v. Mosko,* 654 F.Supp. 402, 414 (D.Colo. 1987) (parties assumed *Franks* applied); *United States v. Dorfman,* 542 F.Supp. 345, 365 n. 17 (N.D.Ill.1982) (government conceded *Franks* applied).

warrant to issue. Where, as here, the allegedly false statements and omissions pertain to the "necessity" requirement for granting a wiretap order, the statements are material only if they would have affected the issuing judge's determination that a wiretap was necessary. *Ippolito*, 774 F.2d at 1485–86.[11] If the warrant would lawfully have issued even after correcting the supporting affidavit (by deleting affirmative false statements and/or supplying material omissions), the contents of the wiretaps should not be suppressed.

–2–

The court begins by setting out the pertinent facts that it finds from a preponderance of the evidence adduced at the hearing on these motions. The court then determines that the Senecal affidavits contain reckless misstatements and omissions. The court finally explains its conclusions that the errors are not material because the pager and telephone wire interception orders would properly have issued had the affidavits been accurate in all respects.

–a–

Norma is the 22–year old daughter of Paula Moya–Aguilar ("Paula"), the niece of Maria and co-defendant, Wenseslada Reyes–Moya ("Wenseslada"), and the cousin of Susie. She has a seventh grade education and is the mother of three children, ages 6, 3, and 1. Her father, mother, and husband are currently serving prison terms for drug crimes.

Norma was not directly involved in the drug organizations run by her aunts, Maria and Wenseslada. She did assist her mother, Paula, in distributing drugs before her mother was convicted and incarcerated. Based upon her relationship with her mother and her mother's heroin trafficking activities, Norma knew substantial details about the heroin organization prior to her mother's arrest. Norma knew sources of supply, the network of distributors, the financial activities, and the people illegally involved with her mother.

In June 1986, following her mother's conviction and lengthy sentences, Norma approached Dallas Police Department narcotics officer Kim Sanders ("Officer Sanders"). Norma had decided to cooperate with law enforcement. She hoped her assistance would permit her mother to obtain an earlier release so that she would not die in prison. Officer Sanders ascertained that Norma intended to cooperate with the government; he then served as Norma's

---

11. In *Ippolito* the Ninth Circuit evaluated the intentionally deceptive statements of an FBI agent to determine if the affidavit, as corrected, contained the required specific showing of circumstances that would render normal investigative techniques particularly ineffective. 774 F.2d at 1486. Because the court concluded "that a reasonable district court judge *could* have denied the application because necessity for the wiretap order had not been shown," *id.* at 1487 (emphasis added), the Ninth Circuit affirmed the district court's suppression of the fruits of a wire interception order. This court questions whether the Ninth Circuit meant to establish so lenient a footing for suppression as to be guided by what a reasonable judge *could* do. *Compare id.* at n. 2 ("reasonable judge *could* decide there was no necessity" (emphasis added)) *with id.* at n. 3 ("determine[ ] whether the issuing court *would* still issue the wiretap order" (emphasis added)). *But see United States v. Carneiro,* 861 F.2d 1171, 1176–83 (9th Cir.1988) (applying "could have" standard).

Nevertheless, this court reads *Franks* to exact a more onerous standard, pursuant to which the district court must decide whether "the affidavit, when corrected for the misleading statements and omissions, failed to establish the necessity of wiretapping as required by law." *See United States v. Simpson,* 813 F.2d 1462, 1472 (9th Cir.) (affirming wiretap suppression order predicated on this standard), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); *accord United States v. Reivich,* 793 F.2d 957, 962 (8th Cir.1986) (courts adopting the *Ippolito* approach "may invalidate a warrant after concluding only that the additional information *might* have affected the probable cause determination and not that the supplemented warrant *could not* have supported the existence of probable cause"); *see also United States v. Orozco,* 630 F.Supp. 1418, 1519 n. 5 (S.D.Cal.1986) (appropriate inquiry is whether omitted information is material to necessity determination); *cf. United States v. Garcia,* 785 F.2d 214, 222 (8th Cir.) (if defendants meet their burden under *Franks,* the court must "set aside those statements and then review the remaining portions of the affidavits to see if what remain[s] [is] sufficient to establish probable cause"), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); *United States v. Cantu,* 625 F.Supp. 656, 663 (N.D.Fla.1985) (test is whether the corrected affidavit establishes probable cause), *aff'd,* 791 F.2d 940 (11th Cir.1986).

primary contact. Officer Sanders' primary focus was to develop cases against a Mexican heroin distributor, Miguel Perales ("Perales"), and Paula's other sources of supply.

The government made no commitment to help Norma's mother in a particular manner. Officer Sanders and his colleagues did indicate they would see what they could do. The government informed Norma that it could only assist her mother by making cases against major heroin distributors. Under the best scenario, an organization run by Perales would be eliminated, Perales would be lured from Mexico for apprehension in the United States, and his heroin distribution network would be stopped. This, in turn, would ameliorate secondary crime that resulted from heroin addiction, to the benefit of the DPD, the DEA, and the FBI. If that occurred, necessary efforts would be undertaken to attempt to obtain concurrent, rather than consecutive, state sentences for Norma's mother.

Norma provided the DEA[12] with information in excess of 100 times between 1986 and 1988. Norma advised the DEA that her mother's incarceration was followed by a split in the Moya family heroin distribution organization. Two of her mother's sisters—defendants Maria and Wenseslada—became the heads of their own large-scale heroin distribution organizations. Norma told Officer Sanders she could see heroin distribution going on "but they [family members] were leery of dealing with her." Tr. 1:28. Norma could act as an observer because she was trusted to some extent as a family member. Therefore, other family members did not attempt to hide their activities from her. She was not trusted completely, however, and certain family members suspected she was a government informant. When Norma observed heroin distribution activities she did so by happenstance; she was looking for a relative and walked in on the activities. Norma did not feel she could gather evidence and ask questions of the defendants without arousing suspicion. Often she got information because family members were mad at one another and their comments were repeated through the family grapevine.

Norma told Officer Sanders in 1986 that, although she was unsure, she thought Perales was the source of Maria's heroin.[13] She based this on knowledge of the purity of Perales' heroin, the price, the way Perales handled the drug, and the likelihood that Maria would have stayed with Perales after Norma's mother was apprehended. Norma later claimed that co-defendants, Adam and Esperanza Adame, were also sources of supply for Maria. Norma told the government Adam was providing multiounce quantities to Maria on a weekly basis and was staying in a Dallas hotel. Norma also informed Officer Sanders about other large-scale cocaine and heroin families and organizations whom she had met through her mother. She advised him she had met Perales on several occasions in the company of her mother.

In 1986 Norma did not claim to know the prices charged and heroin quantities sold by the Moya organization. She stated she knew the family was distributing large quantities of heroin, knew some, but not all, of the dealers it was distributing to, and that she was on the fringe. She could observe certain activities because she was a family member. She could not get involved to the point that she could ask for and receive large quantities of drugs. She could witness her aunt Maria distributing heroin if she were not insistent. Over time, she could observe both Maria and Wenseslada in these activities. Norma occasionally knew when drugs were being shipped into Dallas. It was difficult for

---

12. The court includes Officer Sanders in references to the DEA. Although technically employed by the DPD, Officer Sanders worked closely with the DEA on the narcotics task force.

13. DEA information indicated Maria and Wenseslada had more than one source of heroin. This pattern is consistent with heroin drug distributors. Heroin addicts will go to another source of supply if they cannot obtain the drug. Heroin distributors use alternate sources of supply to avoid losing customers.

her to pinpoint when, where, and how the shipments were to arrive without making obvious that she was seeking information for some questionable purpose.

During 1986 to 1988 Norma informed the DEA she was observing large quantities of heroin in the possession of the defendants. She first saw ounce quantities in the possession of Wenseslada. She also observed that Maria, Susie, and co-defendants, Candido and Jose, had large quantities. Occasionally, she personally witnessed the cutting and packaging of large amounts of heroin by some of the defendants. She provided the addresses where these activities occurred. Officer Sanders felt Norma could witness heroin distribution only occasionally and only by chance. She could be a good eyewitness, in his view, if one could corroborate her testimony with heroin or other evidence.

In February 1987 Norma told the DEA she was capable of making an undercover introduction to Perales. At the time she knew him as "Miguel" from Reynosa, Mexico. Norma had become familiar with Perales through her mother's heroin activities. Norma had delivered money to Perales and knew how to reach him. Perales trusted her to a degree that Norma could implicate him in criminal conduct. She told the government she had wired money to, and knew who was being paid, in McAllen, Texas. She said she could reach Perales through a relative and knew the telephone number in Reynosa. Norma called Perales as early as January 1988, at which time they discussed the purchase and sale of heroin. At that time Norma told the DEA that Maria's current source for heroin was Perales. She also claimed to know of a specific storage unit that contained unadulterated heroin. Between April and July 1987 Norma assisted law enforcement in investigating and making a case against Perales, who presently stands indicted in this court on five counts for conspiring to and possessing with intent to distribute heroin. (DX 17). In 1987, through a taped conversation with Perales, the DEA strengthened its belief that Perales was a source of drugs for Maria. As of June 1988 Norma could not deal with Perales anymore because he was suspicious of her.

Norma was given money to make heroin buys from some of the defendants in the case. She purchased heroin from Maria and Susie in 1988. Norma also claimed to be able to observe Susie's husband, Jose, conduct heroin distribution activities at his body shop. Norma could buy small quantities of heroin from Maria and Susie but could not purchase any amount she wanted.

Of the persons Officer Sanders considered to be at the top of the Moya organization, Norma had direct contact with all three. It is inaccurate that Norma existed only on the fringe of the Moya organization in June 1988. Norma had direct contact with high level organization members and could talk with family members. She could call Perales and talk with him about heroin purchases. She observed quantities as large as one pound being cut and packaged. She and Wenseslada purchased from Perales, during a trip to McAllen, six ounces of heroin at a price that exceeded $10,000.

DEA agents attempted to engage in undercover operations with members of the Moya organization. DEA Agent Polly Lopez ("Agent Lopez") and DPD Officer Roberto Saucedo ("Officer Saucedo") attempted to conduct an undercover purchase of a small amount of heroin from Candido. A hand-to-hand delivery took place as a result of these efforts.

Norma engaged in recorded telephone conversations with the defendants—including Maria, Wenseslada, and Susie—in which the defendants made incriminating statements. The calls occurred in 1988 and possibly in 1987. During eight taped conversations, the incriminated defendants indicated drugs were available; it was difficult, however, to determine if these persons had drugs on hand at the time of each conversation.

The investigation determined that 1436 Templecliff—the location of the telephone that was wiretapped—was one of the main sites for disbursing drugs. No search warrant was issued for this location until De-

cember 1988 when all the defendants were arrested.

Norma informed the government of the trusted role she had. She told the government early-on that she knew sources of supply and could record telephone conversations and meetings. DEA Agent Routh submitted an affidavit on December 12, 1988 (DX 14) in support of the search warrant application for the mini-warehouse. This affidavit states that Norma has outlined in detail Maria's heroin distribution organization and that her efforts have resulted in approximately 40 narcotics cases, 50 arrests, and the seizure of approximately one kilogram of pure heroin and approximately $150,000.

On October 28, 1988 Norma met with Agent Senecal and Officer Sanders and informed them that 75% of the heroin distributed to Maria's faction of the organization came from Perales. By September 1988 Norma claimed to know that Susie was expecting a large shipment of heroin from South Texas—one kilogram of unadulterated heroin per week. She learned Candido was flying into Dallas Love Field with heroin from El Paso or the Rio Grande Valley.

Norma is reluctant to testify or sign statements setting forth her knowledge about heroin activities. She will testify, however, if required to do so. She has never refused to testify before the grand jury or at trial.

–b–

From the foregoing evidence, the court concludes that paragraph 21 of the July 7, 1988 Senecal digital pager affidavit contains some errors and leaves certain misimpressions. Paragraph 21 states:

21. Several investigative techniques which have been tried and failed or reasonably appear likely to fail if tried are as follows:

a. Physical surveillance alone of Paredes–Moya and Moya and the places they frequent will not be sufficient to ascertain with certainty the sources of supply for the heroin that they distribute, the methods used by these sources to obtain heroin, or the identity of co-conspirators. In addi-

tion, the surveillance that has been conducted on several occasions has shown that Paredes–Moya and Moya both appear to be extremely surveillance conscious and in one meeting with undercover agents, Moya told the agent that he believes he is being followed, at which time he refused to deal with the undercover agent. Continued repeated surveillance of Paredes–Moya and Moya therefore raises the danger that the investigation would be exposed.

b. The use of search warrants, investigative grand juries, and interviews is not feasible at this state [sic] because the risk that the subjects and others would be alerted to the investigation, sources would be endangered, and the subjects would become even more circumspect in their activities thus making detection more difficult.

c. Infiltration of Paredes–Moya and Moya narcotics organization by an undercover agent is extremely dangerous, and in any event, highly unlikely to be successful.

d. The cooperating individual can only provide direct evidence as to Moya's participation in narcotics trafficking. However, the cooperating individuals cannot identify other co-conspirators and Moya's source of supply for the heroin.

Agent Senecal's assertion in ¶ 21(d) that the "cooperating individuals cannot identify other co-conspirators and [Maria's] source of supply for the heroin" is not true. Norma is one of the cooperating individuals (CI # 1) mentioned in the affidavit. The evidence is clear that she could identify several other conspirators and was able by early 1987 to identify Perales as a source of Maria's heroin. She also later knew of at least two other suspected sources.

The affidavit failed to disclose the extent to which Norma had interacted with members of the conspiracy. The affidavit does reveal that Norma had direct contact with Maria and other family members. *See* Aff. ¶ 10 ("CI # 1 ... [has] stated that [Maria] and other family members, have told [her]

that [Maria] has rented a number of telephone paging devices ...”). It also reflects Norma was close enough to the organization to know Maria was in Mexico arranging for future deliveries of heroin and would be returning on or about June 30, 1988. ¶ 19. Moreover, the government may have been justifiably hesitant to describe CI # 1 as a family member to avoid focusing suspicion on Norma if the affidavit were inadvertently disclosed. Nevertheless, the affidavit failed to describe Norma's ability to eye-witness, even fortuitously, certain of the drug transactions that form the basis for the present indictment and to contact Moya family members. The affidavit could certainly have described more accurately Norma's knowledge of the organization. As worded, one could reasonably conclude—as the government's November 10, 1988 affidavit would erroneously state—that Norma existed on the fringe of the organization and possessed only compartmentalized knowledge about the organization.

The affidavit also failed to disclose that Norma engaged in secretly recorded conversations with certain of the defendants and Perales. The fact that other types of recordings had successfully been made could reasonably inform a judge's decision whether to authorize a wiretap or to permit interception of the scope or duration requested.

The court rejects the other grounds on which defendants challenge the July 7 affidavit.[14] Paragraph 21 need not have disclosed that the Moya organization had already been infiltrated by an undercover agent. No agent had done so. Similarly, the affidavit was not shown to be inaccurate when it stated that infiltration by an undercover agent was extremely dangerous and highly unlikely to be successful. The evidence reflects that family members—not undercover agents—had a suffi-cient base level of trust to come and go freely. Undercover agents, moreover, were permitted to purchase only small quantities of drugs and were treated circumspectly.

The court finds no fault in the affidavit's failure to disclose Norma's motivation for informing. When a probable cause finding is based in part upon information provided through the use of confidential informants, the credibility and reliability of the informants must be demonstrated utilizing the "totality of the circumstances" test set forth in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The *Gates* standard applies to a wiretap application. *United States v. Zambrana*, 841 F.2d 1320, 1332 (7th Cir. 1988) (applying *Gates* test). Under *Gates* the task of the issuing judge is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332; *Zambrana*, 841 F.2d at 1332.

The July 7, 1988 affidavit of Agent Senecal attempts to establish probable cause for digital pager interceptions based, in part, upon hearsay information provided by Norma. The affidavit states that Norma (CI # 1) is believed to be reliable because information obtained from her has resulted in the purchase of approximately eight ounces of Mexican black tar heroin by DEA special agents. ¶ 10. Norma has also provided the affiant with evidence that Maria was using a specific telephone number paging device to conduct heroin trafficking. *Id.* A DEA agent corroborated this evidence when Candido provided the same pager number during an undercover heroin pur-

---

14. To the extent the defendants rely on grounds raised at the hearing and in their post-hearing submissions that are not addressed in their motions, the court declines to consider them. *Franks* exacts strict standards with which defendants must comply before becoming entitled to a hearing. 438 U.S. at 155–56, 98 S.Ct. at 2676–

77. Were the court to permit a hearing to be expanded once commenced, a defendant could effectively circumvent the threshold showing requirement of *Franks* by raising one basis for suppression and then engaging in a fishing expedition in the hope of finding other grounds.

chase. ¶ 12. Another confidential informant placed a telephone call to the pager number and Candido and Maria jointly returned the call. *Id.* Agent Senecal independently corroborated from the company that supplied the pager service that Maria was the subscriber for this and two other digital pager devices. ¶ 13.

The affidavit need not have disclosed Norma's motivation for informing because the independent corroborative evidence set out in the affidavit was sufficient to establish Norma's credibility and reliability under the "totality of the circumstances" test of *Gates. Cf. United States v. Phillips,* 727 F.2d 392, 399 (5th Cir.1984) (questionable motive for informing can be overcome by detailed tips or statements). Alternatively, assuming *arguendo* that the affidavit was not sufficient, the *Franks* hearing failed to produce evidence that, if known to the issuing judge, would have undermined the finding, from a totality of the circumstances, that there is a fair probability that evidence of a crime would be found if the pager interceptions were allowed.

The court now turns to the November 10, 1988 Senecal affidavit filed in support of the telephone interception application. This affidavit likewise contains errors and omissions.

Paragraphs 69 and 70 of the affidavit, which portions defendants challenge explicitly in their motions, state:

69. Reliable confidential informants/cooperating sources have been developed and used, and will continue to be developed and used, in regard to this investigation, but these sources

—exist on the fringe of this organization and, therefore, they have no direct contact with mid- or high-level members of the organization, or such contact is virtually impossible because the sources have no need to communicate with such individuals.

—refuse to testify before the Grand Jury or at trial because of a fear for person-

al or family safety, or their testimony would be uncorroborated or otherwise would be subject to impeachment (due to prior record, criminal involvement, etc.).

—are no longer associated with the targets of this investigation and their information is included for historical purposes only.

70. None of the confidential informants described in this affidavit are able to furnish information which would fully identify all members of this ongoing criminal conspiracy or which would define the roles of those conspirators sufficiently for prosecution or which would sufficiently identify Maria PAREDES-MOYA's source of supply.

The assertion in ¶ 69 that "[r]eliable confidential informants/cooperating sources have been developed and used ... but these sources—exist on the fringe of this organization" is untrue. The evidence was clear at the hearing that Norma did not exist on the "fringe" of the Moya family organization. The same paragraph is likewise in error in stating that the sources "have no direct contact with mid- or high-level members of the organization." Norma had continuous contact up to the highest members of the Maria and Wenseslada distribution factions. The evidence also revealed to be at least misleading the averment that the sources would "refuse to testify before the Grand Jury or at trial." Norma had indicated—and maintained at the hearing—her reluctance to testify. Nevertheless, it is undisputed that Norma never refused to testify before the grand jury or at a trial.

As with the July 7, 1988 affidavit, the telephone wiretap affidavit is in error at ¶ 70 in claiming that "[n]one of the confidential informants ... are able to ... sufficiently identify [Maria's] source of supply." As the court explains above, Norma had long-before identified Perales and later disclosed other possible sources.[15]

---

15. This error appears to be the result of imprecise drafting. Earlier in Agent Senecal's affidavit, he states that "[Norma] additionally reported that Adam GUERRA is a source of supply for [Maria]." Aff. ¶ 34. The court declines to find that Agent Senecal intentionally misrepresented in ¶ 70 a fact he had already disclosed in ¶ 34.

The court finds no fault in the affidavit's assertion that other investigative procedures had been unsuccessful and in the document's failure to reveal the motives that prompted Norma's cooperation. The court has already held that the government was not required to detail Norma's animus for cooperating with the government. And as the court explains below, the hearing evidence shows the affidavit was substantially accurate in describing the limitations upon physical surveillance (¶ 66), utilization of grand jury subpoenas (¶ 68), undercover police officers and agents (¶ 72), interviews of subjects or associates (¶ 73), search warrants (¶ 74), and pen registers/telephone tolls (¶ 75).

Moreover, unlike the failure of the July 7 affidavit to disclose more fully Norma's knowledge about and contacts with the drug distribution organization, the November 10 affidavit contains substantially greater detail. The telephone wiretap affidavit discloses that Norma's information enabled special agents to purchase eight ounces of Mexican black tar heroin (¶ 11); Norma provided information that caused the issuance of state search warrants and resulted in seizures of heroin, *id.;* she reported that Maria used a particular telephone number to facilitate the Moya family's heroin trafficking business, *id.;* she reported that Maria had moved her heroin business to 1436 Templecliff and was using another telephone number to conduct her drug distribution activities, *id.;* the Moyas were very aware of law enforcement activity in their neighborhood and would not hesitate to approach an officer to ask what he was doing, ¶ 18; Norma reported that Maria was continuing to be active in heroin distribution and Maria used a telephone and her pager to facilitate the business, ¶ 34; Adam was a source of supply for Maria, *id.;* Norma reported that Maria had moved to a house she was building on Lake Tawakoni and was beginning to insulate herself from her daily heroin trafficking

business, ¶ 37; she reported that Maria had terminated use of her old telephone number and had begun using the number at her daughter Susie's house at 1436 Templecliff, *id;* she provided information which revealed that a large quantity of heroin was hidden in the yard at this location and that the heroin belonged to Maria and Susie, ¶ 40; and she provided information that identified Susie as the carrier of a particular digital pager, ¶ 50.

The affidavit also shows that Norma was present on October 6, 1988 at 718 Ezekial,[16] a Moya family home, and witnessed Maria and Susie cut and package one pound of Mexican black tar heroin, ¶ 56. Present on this occasion were six Moya family members. *Id.* Norma witnessed Maria send Susie to deliver one ounce of heroin to another Moya family member.

The affidavit further reflects that Norma placed telephone calls to Maria on October 4 and 7, 1988 for the purpose of purchasing one-quarter ounce of heroin, ¶ 57. On October 7 she purchased this quantity from Susie, ¶ 58. Norma was able to observe an additional quantity of heroin in Susie's car, *id.* The Senecal affidavit also discloses Norma's reporting that Adam was living in Dallas and had moved to Dallas to enhance his ability to distribute heroin there. ¶ 59.

The affidavit did not expressly identify Norma as a family member or provide other facts developed at the extensive evidentiary hearing. Nevertheless, the detail with which Agent Senecal set forth Norma's contacts with and knowledge about the drug organization's activities was sufficient to apprise a reasonable judge of the nature and extent of her assistance.

—c—

■ Having determined that the Senecal affidavits contain certain recklessly false [17] statements and omissions, the court now addresses the question whether the errors were material in causing the interception orders to issue.

---

**16.** *Cf.* Senecal affidavit ¶ 16, which shows the address as "708" Ezekial.

**17.** The court finds that Agent Senecal did not intentionally misrepresent any facts to the court or intentionally conceal any evidence that was pertinent to the issuing judge's decision whether to permit interception.

Defendants contend the false statements and omissions were material because, under the true facts, the government could not have satisfied the "necessity" requirement for obtaining a wiretap order. *See* 18 U.S.C. § 2518(1)(c) & (3)(c). This requirement mandates that other available investigative means must have been tried and failed, or must reasonably appear to be too dangerous or unlikely to succeed if tried, before resort may be made to a wiretap. § 2518(1)(c). According to Maria's telephone wiretap suppression motion, "the wiretap order was really sought to enhance the Government's case in chief." Mot. Supp. Wire Communications at 4. "[The government] sought to intercept telephone conversations merely as a way to help prove its case." *Id. See generally* Werbner Post–Hearing Letter Argument at 4.

Under *Franks* this court must first create hypothetically correct affidavits. The court does this, based upon a preponderance of the hearing evidence, by deleting affirmative false statements from, and supplying material omissions to, the documents.

As hypothetically reconstituted, the Senecal affidavits would reveal that Norma can identify many co-conspirators and certain sources of supply for the Moya organization. The documents would reflect the extent of Norma's contact with other family members and her ability to eye-witness certain heroin distribution activities. Agent Senecal would disclose that Norma made inculpatory recordings of telephone and in-person conversations with conspirators. The affidavits would not falsely state that all confidential informants—including Norma—exist on the fringe of the organization, have no contact with mid- or high-level organization members, and refuse to testify before the grand jury or at trial.

The affidavit would also specifically disclose that Norma is a 22–year–old member of the Moya family and is willing to assist the government as an informant. This informant has a seventh grade education and three young children. She does not desire to testify or sign statements but will do so to help her mother. She has not refused to testify at a trial or before the grand jury. The informant's husband and both parents are in prison. They are unavailable to assist her if her heroin-distributing kin should discover her clandestine activities and turn against her. She is already suspected by some family members of being an informant and is compensated by the DEA. She wants to assist the DEA in order to help her imprisoned mother. Her desire to do so is such that she is willing to assist law enforcement in investigating and convicting several members of her family.

The informant knows certain of the sources of supply of the heroin distribution organization and is trusted by at least one source to the extent that she is permitted to be present when a transaction takes place. She can also talk to the source by telephone and knows generally where the source lives. She does not necessarily know all the supply sources for the principal distributors in the organization. The informant can directly establish the guilt of some family and non-family members with respect to small quantity heroin transactions. She can fortuitously encounter family drug distribution activities because she is a family member who is allowed access to family homes. She does not know in advance that such activities will take place except when she purchases small quantities from family members. She is privy to the general structure of the organization and, in varying degrees, has been involved in the organization for several years.

Even had the affidavits reflected the foregoing, the government would have satisfied the necessity requirement. The errors, therefore, were not material within the meaning of *Franks*.

■ Defendants contend the corrected affidavits would have shown a wiretap was not necessary because of Norma's extensive assistance as an informant. The government may properly assume, however, that a confidential informant-turned-witness may not be available for trial. Susie's counsel pointedly asked Norma whether she recognized the dangers (including life-threatening) of being a witness. Tr. 4B:89–90. Norma could decide for reasons

of fear for her own safety or family loyalty, or on any other subjective basis, that she does not desire to testify. The government may prudently seek independent corroboration of important evidence that would be irretrievably lost if its principal informant were the sole evidentiary source and were to fail to testify. When usual investigative means have been tried and have failed, or reasonably appear to be too dangerous or unlikely to succeed if tried, a wire interception is an appropriate device for obtaining evidence to corroborate information provided by a confidential source.[18]

Moreover, the government must prove its case—including the conspiracy charge (count 1)—beyond a reasonable doubt. The government need not predicate important aspects of its proof substantially upon a witness whose credibility will likely be relentlessly challenged. Defendants argue that Norma's assistance was sufficient to deprive the government of any need for a wiretap. But as the government aptly notes:

> It goes without question that if this case proceeds to trial, these same attorneys who are arguing that the government's case was sufficiently made through the use of Norma Aguilar and other investigative means will most assuredly take the position at trial that Ms. Aguilar's credibility is not worthy of belief and her testimony should be discredited for the reasons which they have previously pointed out.

Jacks Post–Hearing Letter Argument at 5.

Furthermore, the court will likely instruct the jury that the testimony of "an informer for pay ... or for personal advantage ... must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses." Criminal Pattern Jury Instructions for the Fifth Circuit (March 1989 Preliminary Draft). The admonition will also provide that the jury "should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt."

*Id.* Where the government has otherwise satisfied the requirements of Title III, it should not be constricted in its proof to one whose testimony, without corroboration, will be subject to very strict scrutiny at trial.

■ The court also disagrees that the corrected affidavits otherwise fail to satisfy the necessity requirement. As the Fifth Circuit explained in *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984):

> the purpose of § 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted. Rather, the section is designed to inform the issuing judge of the difficulties involved in the use of conventional techniques and to insure that wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose crime.

*See also United States v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987) (government not required to exhaust every conceivable means); *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir.) (same), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987); *United States v. Cole*, 807 F.2d 262, 267 (1st Cir.1986) (purpose is to assure wiretap is not first resort); *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir.) (government only required to give serious consideration to other means), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985); *United States v. Martin*, 599 F.2d 880, 887 (9th Cir.) (not required to exhaust all means), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979).

The DEA used several investigative techniques prior to applying for the wire interceptions: physical surveillance, undercover purchases, informants, clone pagers, trash searches, and pen registers. The government attempted through a confidential informant, Marcella Pena ("Pena"), to purchase heroin from targets of the investiga-

---

**18.** Moreover, before seeking an indictment against a person, the government should attempt to corroborate such charges through other sources of proof.

tion.[19] The government was able to purchase approximately two small packages of heroin from Candido in January 1988. The DEA attempted to use three undercover police officers: DEA Special Agents Lopez and Timothy Stover ("Agent Stover") and DPD Officer Saucedo. All three made contact with Candido but the initial purchases—one-quarter ounce each—were too small to prove a conspiracy of the dimensions the government suspected. After the initial transactions, however, the officers were unsuccessful in negotiating a transaction with Candido.

Candido and Robert Moya ("Robert") were extremely surveillance conscious. Agents Stover and Lopez engaged in an undercover operation with them in which the location was moved when the Moyas suspected the presence of undercover agents and undertook several steps to detect law enforcement. Agents Stover and Lopez had no further transactions with them. Agent Lopez talked to Candido but he declined to deal with her. These transactions produced no evidence directly implicating Maria and Susie.

The principal problem the DEA had with physical surveillance was its inability to place agents close to surveillance conscious subjects without being detected. Susie and her husband moved from their home and were gone for two weeks following an encounter with an unmarked DEA vehicle. Additionally, Moya family members engaged in countersurveillance activities and followed DEA agents who attempted to surveil one family member's house. The family also kept license plate numbers of suspected vehicles.

Eight or nine times prior to applying for wire interceptions, the government searched the discarded trash of the targets. These searches did not always produce any probative evidence.[20] The agents also subpoenaed telephone toll records and used

recording devices and transmitters where possible.

Although Norma—the government's principal informant—was able to observe heroin being distributed, she did not know in advance that a large amount would be present when she was in attendance as well. Even had the agents obtained a search warrant for the heroin, it is likely they would have come up empty-handed at the time the warrant was executed. Only Norma's statement supported her having seen one pound of heroin at her grandmother's house at 718 Ezekial; the DEA had no other substantiation for this information.

The DEA was interested in establishing the identity of Maria's suppliers but had no telephone toll records or pen registers to verify Norma's disclosure that Perales represented 75% of Maria's heroin supply. For several months prior to the DEA's applying for the telephone wiretap, Norma had had no contact with Perales. Agent Senecal testified several people could repeatedly have told him Perales was supplying Maria with heroin but such unsubstantiated statements would not constitute evidence necessary for prosecution. Agent Senecal hoped the wiretap would identify the sources of supply and when significant deliveries were being made to Maria from these sources. Norma was not able to tell the DEA when specific deliveries would be made. As a family member, she was allowed to associate with the family and to obtain information from family members. She did not have direct knowledge when a specific heroin package would be delivered to Maria at a specific location. The DEA did not believe Norma could successfully elicit incriminating information by asking questions of family members about the heroin business without risking detection.

 The court rejects defendants' necessity analysis on an additional ground, as

---

**19.** Pena ceased to be an informant for the DEA when she was arrested for possession of heroin on state charges.

**20.** According to Agent Senecal's November 10, 1988 affidavit, a search of trash on August 5, 1988 at the residence of co-defendant, Rosalie

Walker, revealed over 30 small plastic pouches containing trace amounts of suspected heroin, assorted syringes, razor blades, syringe packages, and miscellaneous documents reflecting narcotics transactions. (¶ 29).

well. The government is entitled to investigate and to seek indictments and convictions for larger-scale drug offenses than might readily be established without a wiretap order. *See United States v. Johnson,* 645 F.2d 865, 867 (10th Cir.) (government entitled to learn all members and dimensions of conspiracy), *cert. denied,* 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981); *United States v. Sandoval,* 550 F.2d 427, 429–30 (9th Cir.1976) (government entitled to apprehend satellite members as well as major players), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *United States v. Baynes,* 400 F.Supp. 285, 300 (E.D.Pa.1975) (government "not obliged to conclude its investigation because it obtains certain minimal or threshold evidence of a defendant's culpability"). The government concedes that Norma's testimony, corroborated by that of undercover agents who purchased drugs from defendants in this case, could have resulted in charges involving "small amounts of heroin" and "in which only the person supplying the heroin or directly involved in setting up the heroin transaction could be charged." Jacks Post–Hearing Letter Argument at 5. But the government is not required to fight the drug war one street corner at a time. It may wage major campaigns against cartels and distribution organizations as long as it does so agreeably with the Constitution and laws of the United States.

The reconstituted affidavits amply demonstrate the necessity for the pager and telephone interception orders. Defendants have failed to sustain a basis for suppressing the fruits of these interceptions.

### IV.

The court now turns to certain remaining miscellaneous matters. Susie's counsel requested that the court review *in camera* government exhibit O ("GX O") for the purpose of ascertaining whether any portion contradicts the hearing testimony of Norma or Agent Senecal. Her counsel also asked that the court review pages 285–296 from a DEA agent's manual to determine whether Susie should be permitted to examine these pages for the purpose of cross-examining Agent Senecal. Finally, her counsel requested that the court permit a questioned document examiner to compare a signature on defendant exhibit 31 ("DX 31") that purports to be Norma's with known signatures of Norma and DEA agents. The court declines to grant the relief requested.

■ While the court may, in connection with the trial of this case, determine that withheld portions of GX O must be disclosed pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[21] the court reads Susie's obligation under *Franks* to require that she make a substantial preliminary showing that a false statement or omission was knowingly and intentionally made or made in reckless disregard for the truth. It is therefore insufficient to ask the court to require the government to disclose portions or all of a document for purposes of a *Franks* hearing on the basis that defendant may be able to use the document at a trial on the merits.

The court also declines to require the DEA to disclose the portions of its manual that concern telephone interceptions. The court has already determined that the wiretap orders would lawfully have issued even had the issuing judge been aware of the facts known to the DEA. The hearing record reflects that the pertinence of the DEA manual is to show that Agent Senecal acted intentionally or at least recklessly in drafting the affidavits. The court has already agreed with defendants that, as to the erroneous portions of the affidavits, the agent acted recklessly. Defendants' need to review the DEA manual is therefore moot. Alternatively, if some need remains, it does not outweigh the substantial interest of the government in maintaining the secrecy of its manual.[22]

---

**21.** In fact, in connection with this hearing the court ordered the government to disclose DEA 6 forms and statements that the government asserted it was not obligated to disclose.

**22.** The government submitted the pages to the court for *in camera* inspection. On September 22, 1989, the court returned the documents to government's counsel. Upon defendant's re-

Susie finally asks the court to permit her to have a questioned document examiner determine whether Norma or a DEA agent signed DX 31. There is a dispute in the record regarding who signed this document, *compare* Tr. 4B:140–143 *with* Tr. 5:96–97, and the court has determined the signature on DX 31 is unlike any other signature in GX O that purports to be Norma's. Tr. 4B:140. While the issue may be one for trial, it does not require resolution at the motion stage. Under *Franks* Susie cannot rest her suppression motion on a ground on which she could not have made a substantial preliminary showing at the time she filed her motion. Moreover, while the credibility that the court attributes to the testimony of Norma and Agent Senecal certainly is integral to the court's decision on the suppression motions, the variance in the pertinent testimony does not present the witnesses squarely in conflict on a matter that the court views as dispositive. Following repeated questioning, Tr. 4B:140–143, Norma testified she did not think it possible that the signature was hers but her initial answers were somewhat equivocal. *E.g.*, Tr. 4B:143 ("I didn't say it wasn't my writing. I just said it don't look like it"). In any event, Norma unqualifiedly adopted the content of DX 31 as her true and accurate statement. *Id.* at 106–07.

## V.

The motions to suppress are denied for the reasons stated in this opinion, which is issued in explanation of the court's September 21, 1989 order.

quest, the court will direct the government to preserve them for appeal purposes.